1   BRODSKY & SMITH, LLC
    Evan J. Smith (SBN242352)
2   9595 Wilshire Boulevard, Suite 900
    Beverly Hills, CA 90212
3   Tel.: (877) 534-2590
    Fax: (310) 247-0160
4

5   LEVI & KORSINSKY LLP
    Shannon L. Hopkins (*to be admitted pro hac vice*)
6   Sebastiano Tornatore (*to be admitted pro hac vice*)
7   733 Summer Street, Suite 304
    Stamford, CT 06901
8   Tel:   203-992-4523
    Fax:  212-363-7171
9

10  *Attorneys for Plaintiff*
11

12              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
13                    SOUTHERN DIVISION

14
    CYNTHIA LEHN, individually and on          Case No.
15  behalf of all others similarly situated,

16                             Plaintiff,       CLASS ACTION
17
        v.                                      **CLASS ACTION COMPLAINT
18                                              FOR:**
    MULTI-FINELINE ELECTRONIX,
19  INC., PHILIPPE LEMAITRE, REZA              **(1) Violation of § 14(a) of the
20  MESHGIN, LINDA Y.C. LIM, PH.D.,                Securities Exchange Act of 1934
                                                   (17 U.S.C. § 78n(a))**
21  JAMES M. MCCLUNEY, DONALD K.               **(2) Violation of § 20(a) of the
22  SCHWANZ, ROY CHEE KEONG TAN,                   Securities Exchange Act of 1934
                                                   (17 U.S.C. § 78t(a))**
23   SAM YAU, SUZHOU DONGSHAN                   **(3) Aiding and Abetting**
24  PRECISION MANUFACTURING CO.,
25  LTD., and DRAGON ELECTRONIX                **DEMAND FOR JURY TRIAL**
26  MERGER SUB INC.,

27                             Defendants.
28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Cynthia Lehn ("Plaintiff"), by her attorneys, alleges upon information and belief, except for her own acts, which are alleged on knowledge, as follows:

## SUMMARY OF THE ACTION

1.     This is a stockholder class action brought by Plaintiff on behalf of herself and all other similarly situated public stockholders of Multi-Fineline Electronix, Inc. ("MFlex" or the "Company"): (1) against MFlex and its board of directors (the "Board" or "Individual Defendants" for violating Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 17 U.S.C. § 78n, by making material misrepresentations and omissions in the Schedule 14A Definitive Proxy Statement that MFlex filed with the U.S. Securities and Exchange Commission (the "SEC") on April 28, 2016 (the "Proxy"); (2) against the Individual Defendants for violating Section 20(a) of the Exchange Act, 17 U.S.C. § 78t(a); and (3) against Suzhou Dongshan Precision Manufacturing Co., Ltd. ("Parent"), and its wholly-owned subsidiary, Dragon Electronix Merger Sub Inc. ("Merger Sub" and, together with Parent, "Suzhou" and collectively with the MFlex and the Individual Defendants, the "Defendants") for aiding and abetting such violations.

2.     This action seeks to enjoin Defendants from further violating the federal securities laws and/or aiding and abetting such violations in their pursuit of a sale of the Company at an unfair price and through an unfair and self-serving process to Suzhou.

3. Headquartered in Irvine, California, MFlex provides high-quality, technologically advanced flexible printed circuits and value-added component assembly solutions to the electronics industry.

4. On February 4, 2016, the Company announced that it had entered into an Agreement and Plan of Merger, dated February 4, 2016 (the "Merger Agreement"), pursuant to which Suzhou would acquire the Company in an all-cash transaction valued at approximately $610 million (the "Proposed Transaction"). Pursuant to the Merger Agreement, MFlex stockholders are only anticipated to receive $23.95 per share in cash for each share of MFlex owned (the "Merger Consideration").

5. The Proposed Transaction is the result of an unfair and flawed process in which defendant Reza Meshgin ("Meshgin"), the Company's President and Chief Executive Officer ("CEO"), and defendant Roy Chee Keong Tan ("Tan"), Group Chief Financial Officer of United Engineers Limited ("UEL"), the Company's largest stockholder which holds 60.2% of MFlex's outstanding common stock, run the process and negotiations with Suzhou to further their own personal agendas. Specifically, Meshgin steered the process towards a deal with Suzhou in order keep his position of CEO in the merged company, while Tan was charged with selling UEL's large block of otherwise illiquid MFlex stock in order to achieve UEL's "strategic objective" to "exit from non-strategic or non-core operations of WBL."

6. In order to facilitate a deal with Suzhou, defendant Meshgin during an April 23, 2015 meeting with Xiu Tian Zhao ("Zhao"), Vice Chairman of Suzhou,

Yonggang Yuan ("Yuan"), Suzhou's Chairman and one of Suzhou's large stockholders, recommended that Suzhou retain Meshgin's favored financial advisor, Citigroup Global Markets Inc. ("Citigroup"), with which he had a prior undisclosed relationship. Meshgin then introduced Zhao to his contact at Citigroup by email and Suzhou retained Citigroup as its financial advisor in the Proposed Transaction.

7.     Thereafter, the Board conducted a cursory process in which it contacted only five or six parties over just a two-day period. Prior to entering into the Merger Agreement, the Board received a higher offer for the Company from a consortium (the "Consortium"). Yet the Board inexplicably determined not to engage with the Consortium, thereby leaving a potentially higher offer on the table in favor of its preferred acquiror, Suzhou.

8.     As a result of the unfair process, the Proposed Transaction price wholly undervalues MFlex. The $23.95 Merger Consideration represents a ***discount of 8% to the Company's 52-week high trading price of $26.05*** on May 22, 2015. In addition, MFlex common stock traded at $24.66 per share as recently as November 27, 2015. Even the analyses performed by the Company's own financial advisor, Jefferies LLC ("Jefferies"), resulted in a higher value for MFlex. Specifically, Jefferies' *Selected Public Companies Analysis* and *Selected Precedent Transactions Analysis* yielded values for MFlex as high as $25.01 and $35.76 per share, respectively. Moreover, given the strength of the Company and its poise for future success propelled by its relationships with several major players in the electronics industry, Suzhou will

acquire MFlex at an unreasonably low price if the Proposed Transaction is permitted to close, particularly as the Company has been maintaining meaningful growth from the previous year.

9.     The Board then locked up the Proposed Transaction with preclusive deal protection devices that effectively prevent another interested party, such as the Consortium, from making a superior offer.   Specifically, pursuant to the Merger Agreement, defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even in continuing discussions and negotiations with potential acquirers; (ii) an information rights provision that requires the Company to disclose confidential information about competing bids to Suzhou within twenty-four hours; (iii) a matching rights provision that provides Suzhou with five (5) business days to merely match any competing proposal in the event one is made; and (iv) a prohibitively large termination fee of $18.3 million.

10.     Moreover, UEL has entered into a support agreement in which UEL agreed to vote 9,720,610 shares of its common stock, or approximately 39.5% of its total outstanding shares, in favor of the Proposed Transaction (the "Support Agreement").   UEL and the Company also entered into an indemnification letter, pursuant to which UEL agreed to pay to Suzhou, on behalf of the Company, the entire termination fee if the termination fee becomes payable as a result of MFlex's stockholders not approving the deal (the "Indemnification Letter").

11.     While only 39.5% of UEL's 60.2% ownership interest in MFlex is technically locked up, effectively its entire 60.2% interest is locked up in favor of the Proposed Transaction.   Indeed, the Proxy states that "we understand that UEL currently intends to support the merger with all of its shares of common stock." Moreover, it makes no sense that UEL would vote the remaining 20.7% against the deal, particularly where UEL is on the hook to pay the entire $18.3 million termination fee in the event MFlex stockholders do not vote the deal through.

12.     These deal protection provisions, particularly when considered collectively, substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of MFlex. Moreover, the Board failed to insist upon a majority-of-the-minority voting provision to ensure MFlex's minority stockholders have a say in this transaction.

13.     Further exacerbating the unfairness of the Proposed Transaction, on April 28, 2016, MFlex filed the Proxy. Defendants caused the Proxy to be filed, which failed to make all material disclosures and contained materially misleading statements about the Proposed Transaction.   The Proxy omits and/or misrepresents material facts concerning among other things: (i) the sales process and the process by which the Board entered into the Proposed Transaction; (ii) conflicts of interest: (iii) the key data and inputs underlying the financial valuation methodologies that purport to support

the fairness opinion provided to the Company's Board by Jefferies; and (iv) management's financial projections relied upon by Jefferies in its financial analyses.

14.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Individual Defendants' violations of the federal securities laws.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over the claims for violations of §§ 14(a) and 20(a) of the Exchange Act pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa. Federal courts have "exclusive jurisdiction . . . of all suits in equity and actions at law brought to enforce any liability or duty created by" the Exchange Act. In addition, this Court has jurisdiction over the claims for violations of §§14(a) and 20(a) of the Exchange Act, pursuant to 28 U.S.C. §1331, because the claims arise under the laws of the United States.

16.     This Court has personal jurisdiction over Defendants because they conduct business in California, including, but not limited to, the conduct here at issue, the unfair Proposed Transaction, and because they have sufficient minimum contacts with California to render the exercise of jurisdiction by California courts permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this Court pursuant § 27 of the Exchange Act because acts or transactions constituting the violations of the Exchange Act took place in this

District and defendants transacted business in this District.  Venue in this Court is also proper pursuant to 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to the claims in this Complaint took place in this District.

## THE PARTIES

18.    Plaintiff is, and at all times relevant hereto was, a stockholder of MFlex.

19.    Defendant MFlex is a corporation organized and existing under the laws of Delaware, with its principal executive offices located at 8659 Research Drive, Irvine, California 92618.  MFlex's common stock is traded on the NASDAQ Global Select Market under the ticker symbol "MFLX."

20.    Defendant Philippe Lemaitre ("Lemaitre") is the Chairman of the Board, having joined the Board in March 2009.  Lemaitre is also a member of the Board's Audit and Nominating and Corporate Governance Committees.

21.    Defendant Meshgin has been the president, CEO, and a director of the Company since 2008.  Meshgin will be continuing on as CEO of the merged company.

22.    Defendant Linda Y.C. Lim, Ph.D. ("Lim") has been a member of the Board since March 2008.  Lim is also the Chair of the Board's Nominating and Corporate Governance Committee and a member of its Compensation Committee.

23.    Defendant James M. McCluney ("McCluney") has been a member of the Board since August 2013. McCluney is also the Chair of the Board's Compensation Committee and a member of its Audit Committee.

24.    Defendant Donald K. Schwanz ("Schwanz") has been a member of the Board since April 2008.   Schwanz is also a member of the Board's Audit and Nominating and Corporate Governance Committees.

25.    Defendant Roy Chee Keong Tan has been a member of the Board since 2012.

26.    Defendant Sam Yau ("Yau") has been a member of the Board since June 2004.  Yau is also the Chair of the Board's Audit Committee and a member of the Board's Compensation Committee.

27.    Defendant Parent is a corporation organized and existing under the laws of the People's Republic of China.  Parent develops, manufactures, and sells precision metal plate and cast metal.

28.    Defendant Merger Sub is a Delaware corporation and a wholly owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

29.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of MFlex common stock who are being and will be harmed by defendants' actions described herein (the "Class").  The Class specifically excludes defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

30.    This action is properly maintainable as a class action because:

(a)     The Class is so numerous that joinder of all members is impracticable.  According to the Merger Agreement, as of the close of business on February 1, 2016, there were approximately 24.6 million shares of MFlex common stock issued and outstanding.  The actual number of public stockholders of MFlex will be ascertained through discovery;

(b)     There are questions of law and fact which are common to the Class, including *inter alia*, the following:

    i.    Whether Defendants have violated the federal securities laws;

    ii.    Whether Defendants made material misrepresentations and/or omitted material facts in the Proxy; and

    iii.    Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Transaction is consummated.

(c)     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

(d)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(f)     Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

(g)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND OF THE COMPANY AND ITS POSITIONING IN AN EXPANDING INDUSTRY

31.     Founded in 1984 and reincorporated in Delaware in 2004, MFlex engages in the engineering, design, and manufacture of flexible printed circuit boards and related component assemblies for the electronics industry. The Company provides its solutions to original equipment manufacturers ("OEMs") and to electronic manufacturing services ("EMS") providers.

32.     The Company's historical revenue has been concentrated on a small number of key customers and their subcontractors, with Apple, Inc. ("Apple") leading the way and accounting for 75%, 76%, and 75% of the total MFlex net sales in 2015, 2014, and 2013, respectively.

33.    MFlex's relationship with Apple and other mobile device providers is integral, as electronic devices become more functional, complex, and compact, product size and electrical performance become the major design factors.

34.    As a result, the flexible printed circuits area where MFlex focuses is poised to continue growing along with favorable technological and market developments.  Indeed, in discussing its financial results for the third quarter 2015, Defendant Meshgin stated on November 5, 2015:

> Longer term, we remain extremely optimistic about our prospect. We are continuously engaged with our customers to provide engineering support to promote the benefit and utilization of FLEX based interconnect technology.
>
> **_For the fourth quarter of 2015, we expect net sales to increase sequentially to 170 million and 200 million_** as we deliver a full quarter of volume production on various new programs.  We expect gross margins to range between 10.5% and 13% based on anticipated production build plans, net sales volume and product mix.
>
> **_This coupled with our strong results year-to-date support significant profitability for full year 2015_**, demonstrating that we are squarely back on track with our new operating model.

35.    In addition, in connection with merger announcement, the Company reported fourth quarter and full-year 2015 financial results.  For the quarter, the Company maintained its sixth consecutive quarter of strong profitability. Lauding the results, Defendant Meshgin noted:

> [W]e had solid operational performance and proactively controlled our costs, and achieved our sixth consecutive quarter of strong profitability. We also successfully managed our working capital, generating strong operating cash flows and growing our cash balance to $214 million, an all-time record for MFLEX.

36.    Despite the Company's financial strength and position as a premier player in the electronics industry, the Individual Defendants have entered into the Merger

Agreement with Suzhou, depriving Plaintiff and the other minority public stockholders of MFlex the opportunity to participate in the growth of the Company in which they have loyally invested.

## THE MERGER WAS THE RESULT OF A FLAWED SALES PROCESS MARRED WITH CONFLICTS OF INTEREST

37.     The process deployed by the Individual Defendants and run almost entirely by defendant Meshgin and Tan was unfair and inadequate.  The Board conducted a very limited market check, spending only *two days* contacting *five parties*, before agreeing to a deal with its preferred bidder, Suzhou.  Further, the Board allowed conflicted defendants Meshgin and Tan steer the sales process to Suzhou, with which Meshgin was having employment discussions throughout the process and will be staying on as CEO of the combined company.

38.     Ideas of a proposed transaction between Suzhou and MFlex were first discussed in October 2014, when Zhao, Vice Chairman of Suzhou, contacted defendant Tan, then-Chief Strategy Officer, now Group Chief Financial Officer of UEL, a holder of 60.2% of MFLEX common stock, on various occasions seeking to have exploratory discussions regarding the potential acquisition of MFlex by Suzhou. Defendant Tan suggested Zhao deal directly with MFlex, since Suzhou was interested in acquiring the Company, and not just UEL's shares.

39.     Knowing that UEL's opinion was the only one that mattered, Zhao did not contact defendant Meshgin until March 2015, *five months later*, to discuss a potential transaction between MFlex and Suzhou.

40.     On April 23, 2015, Zhao, Yuan, and one of Suzhou's major stockholders, met with Defendant Meshgin to discuss possible terms of a potential transaction, likely including Meshgin's employment role in the merged company.  During this meeting, defendant Meshgin recommended that Suzhou hire Citigroup as its financial advisor because Citigroup was "familiar with MFlex's business."  The Proxy does not disclose the nature of MFlex's relationship with Citigroup.

41.     Suzhou agreed to meet with Citigroup.  Defendant Meshgin then introduced Zhao by email to his contact at Citigroup and Suzhou proceeded to retain Citigroup as its financial advisor in the transaction.

42.     On June 25, 2015, both MFlex and Suzhou executed mutual nondisclosure agreements.

43.     On July 12, 2015, the Board determined to engage Jefferies as the Company's financial advisor, which was finalized in an engagement letter the next day.

44.     On July 11 and August 31, 2015, Suzhou submitted an offer to acquire the Company for between $21.05 to $25.06 per share.  On September 3, 2015, Suzhou settled on an offer of $21.60 per share.

45.     At a September 17-18, 2015 Board meeting, the Board instructed Defendant Meshgin to convey to Suzhou that it would not move forward with Suzhou unless it offered no less than $24.00 per share in cash, effectively signaling a ceiling

on the offer price.  The Proxy, however, does not provide details as to how the Board determined that $24.00 was a sufficient price.

46.    On October 20, 2015, Suzhou submitted a revised offer of $610 million, or approximately $23.74 per share, still below the Board's required price of $24.00 per share.

47.    During a Board meeting on October 30, 2015, the Board finally instructed Jefferies to perform a market check of other potentially interested parties, one year after Zhao first contacted Defendant Tan and seven months after Zhao contacted Defendant Meshgin.

48.    Jefferies then prepared a list of potential bidders, though the Proxy remains silent as to how many potential bidders were on this list.  The Company then inexplicably narrowed this list down to six potential bidders.  The Board instructed Jefferies to contact five of those parties and defendant Meshgin to contact the sixth party due to his existing relationship with that party.

49.    Jefferies spent only *two days,* from November 3, 2015 to November 5, 2015, reaching out to the five potential bidders.  The Proxy is unclear as to when the sixth party, to be contacted by Defendant Meshgin, was actually, if ever, contacted, and the results of their communication.

50.    To ensure that the Board entered into a deal with Suzhou, on December 14, 2015, Christine Besnard ("Besnard"), MFlex's General Counsel, sent a draft letter agreement (the "UEL Indemnification Letter"), to Defendant Tan, pursuant to which

UEL would agree to pay the Company termination fee on behalf of the Company if the fee became payable because MFlex was unable to obtain stockholder approval for the Proposed Transaction.

51.     From December 19, 2015 to February 1, 2016, UEL and Suzhou also negotiated a support agreement, pursuant to which UEL would vote 9,720,610 shares of its common stock, approximately 39.5% of the total outstanding shares of common stock of MFlex, in favor of the Proposed Transaction.

52.     On December 23, 2015, MFlex received an unsolicited letter from a consortium consisting of two financial buyers based in the People's Republic of China ("PRC") expressing an interest in acquiring MFlex.  The Consortium sent a revised proposal on January 18, 2016, to purchase 100% of MFlex's stock at a price of $530 million to $631 million, or $21.00 to $25.00 per share, well above Suzhou's offer.

53.     Despite that the Board had a potentially higher offer on the table from the Consortium, on January 27, 2016, it inexplicably determined to take no further action with respect to the Consortium's offer, nor did it attempt to obtain a higher price from Suzhou or create any sort of competitive bidding war.

54.     On February 1, 2016, the Consortium sent another letter, reaffirming its offer of $530 to $631 million and stating that the Consortium had sufficient equity financing and highly confident letters or term sheets from a syndicate of banks indicating potential for debt financing of up to $400 million.  However, the Board ignored the Consortium's proposal.

55.    The Board held a meeting on February 3, 2016, during which it had final discussions regarding the merger agreement.    Towards the end of the meeting, Defendant Tan recused himself *for the first time* during the entire process.    The remaining Board members, ***including a conflicted defendant Meshgin who will stay on as CEO with Suzhou***, voted to approve the Merger Agreement.

56.    On February 4, 2016, the Board held another meeting during which Jefferies delivered its oral fairness opinion to the Board.    MFlex and Suzhou then executed the Merger Agreement and issued a joint press release announcing its execution.

## THE PROPOSED TRANSACTION

57.    On February 4, 2016, the Company issued a press release announcing the Proposed Transaction.    That press release stated, in relevant part:

> IRVINE, Calif. and SUZHOU, China, Feb. 4, 2016 /PRNewswire/ -- Multi-Fineline Electronix, Inc. (NASDAQ: MFLX) (the "Company" or "MFLEX"), a leading global provider of high-quality, technologically advanced flexible printed circuits and assemblies, and Suzhou Dongshan Precision Manufacturing Co., Ltd. ("DSBJ") (SZSE: 002384), one of the largest suppliers of precision sheet metal components, headquartered in Suzhou, China, today announced that they have entered into a definitive merger agreement providing for DSBJ's acquisition of MFLEX. Under the terms of the agreement, MFLEX stockholders will receive $23.95 in cash for each share of MFLEX common stock held at the close of the transaction. The transaction will be funded by DSBJ through a combination of cash on hand, existing credit facilities and new debt financing, and is not subject to a financing condition. The proposed transaction values MFLEX's equity at approximately $610.0 million, on a fully diluted basis, and represents a premium of 40.8% over MFLEX's closing stock price on February 3, 2016 and a premium of 52.2% over its thirty-day volume-weighted average closing stock price. The agreement was unanimously approved by the respective Board of Directors of MFLEX and DSBJ.
>
> "We are pleased to have reached this agreement, which we believe realizes significant, immediate cash value for our stockholders, offers new opportunities for our employees and supports the future needs of our customers," said Reza Meshgin, Chief Executive Officer of MFLEX.

"Positioning MFLEX within a larger manufacturing conglomerate will also open new market opportunities for our flexible printed circuit and assembly solutions, further supporting the Company's long-term growth outlook. In turn, our Board has unanimously concluded that partnering with DSBJ is the best strategic path forward for MFLEX."

"This transaction is a continuation of our growth and diversification strategy, and represents a new milestone in DSBJ's 35- year business history," said Yuan Yonggang, Chairman and President of DSBJ. "The outstanding management team and employees of MFLEX have built a global leader in flexible printed circuit design and manufacturing with a marquee customer list. Working together, we believe we can expand MFLEX's brand and leadership in the mobility space, while accelerating market opportunities in the automotive, industrial, display and other fast-growing consumer segments. There are meaningful sales synergies we expect to realize through this acquisition given our complementary customer, product and manufacturing footprints."

The transaction, which is expected to close in the third quarter of fiscal 2016, is subject to approval by MFLEX and DSBJ stockholders, regulatory approvals, including antitrust review in the U.S. and the People's Republic of China, review and clearance by the Committee on Foreign Investment in the U.S. and other customary closing conditions. Following the closing of the transaction, MFLEX will continue to make its headquarters in Irvine, California as an independent business unit of DSBJ. Mr. Meshgin and the MFLEX senior management team are expected to remain with MFLEX in their same capacities.

\*\*\*

58.     Also on February 4, 2016, the Company filed a Form 8-K with the SEC, wherein it attached the Merger Agreement.  Collectively, the press release announcing the transaction and the filing of the Merger Agreement reveal that the Proposed Transaction is the product of a flawed sales process and, unless the Merger Consideration is increased, would be consummated at an unfair price.

59.     Furthermore, the sale of the Company is being timed in an effort to curb any future increase in the share price of MFlex common stock, thus ensuring that Suzhou can effectuate its takeover on the cheap.  As such, the Proposed Transaction wholly undervalues MFlex because the Merger Consideration represents a discount *of 8% to the Company's 52-week high trading price of $26.05*. Additionally, the $23.95

per share Merger Consideration significantly undervalues MFlex given the significant benefits Suzhou and its stockholders will enjoy upon taking the Company over. Even Jefferies' analyses supports a higher price -- Jefferies' *Selected Public Companies Analysis* and *Selected Precedent Transactions Analysis* yielded values for MFlex as high as $25.01 and $35.76 per share, respectively.

60. Moreover, the Company is poised to enjoy a lengthy period of significant growth as it offers new products and expands into burgeoning markets, growth that Plaintiff and the Class will be foreclosed from fully enjoying upon the consummation of the Proposed Transaction.

## THE MERGER AGREEMENT UNFAIRLY DETERS COMPETITIVE OFFERS AND IS UNDULY BENEFICIAL TO SUZHOU

61. The Proposed Transaction is also unfair because, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction *a fait accompli* and ensure that no competing offers will emerge for the Company.

62. First, Section 8.4 of the Merger Agreement explicitly prohibits MFlex or any of its affiliates from soliciting or proactively seeking a competing or better offer, as Section 8.4(a) states:

(a) Except as otherwise expressly contemplated by this Section 8.4, the Company shall not, nor shall it authorize or permit any of its Representatives to, directly or indirectly, (i) solicit or initiate, or knowingly encourage, induce or facilitate (including by way of providing information) any Alternative Transaction Proposal or any inquiry or proposal that constitutes or may reasonably be expected to result in an Alternative Transaction Proposal, (ii) participate in any discussions or negotiations with any Person regarding, or furnish to any Person any nonpublic information with respect to, or cooperate in any way with any

Person (whether or not a Person making an Alternative Transaction Proposal) with respect to any Alternative Transaction Proposal or any inquiry or proposal that may reasonably be expected to result in an Alternative Transaction Proposal, (iii) approve or recommend any Alternative Transaction Proposal, (iv) approve or recommend, or execute or enter into, any letter of intent, agreement in principle, memorandum of understanding, merger agreement, asset or share purchase or share exchange agreement, option agreement or other similar agreement related to any Alternative Transaction Proposal (an "Acquisition Agreement") or (v) enter into any agreement or agreement in principle requiring the Company to abandon, terminate or fail to consummate the transactions contemplated hereby or breach its obligations hereunder.

63.     Section 8.4 further expands the restriction, stating that:

The Company shall, and shall cause its Representatives to, immediately cease and cause to be terminated all existing discussions or negotiations (if any) with any Person conducted heretofore with respect to any Alternative Transaction Proposal, or any inquiry or proposal that may reasonably be expected to result in an Alternative Transaction Proposal, request the prompt return or destruction of all confidential information previously furnished and immediately terminate all physical and electronic data room access previously granted to any such Person or its Representatives.

64.     In addition, Section 8.4 grants Suzhou recurring and unlimited matching rights, which gives MFlex twenty-four (24) hours to provide unfettered access to confidential, non-public information about competing proposals from third parties which Suzhou can then use to prepare a matching bid.  Additionally, Section 8.4(c) grants Suzhou five (5) business days to negotiate with MFlex, amend the terms of the Merger Agreement, and make a counter-offer that only matches the superior third-party offer.

65.     This matching rights provision essentially ensures that no superior bidder will emerge, as any potential suitor will be unlikely to expend the time, cost and effort to perform due diligence and make a superior proposal while knowing that Suzhou will know of its bid and the details and terms thereof and can easily top it. As a result,

the matching rights provision unreasonably favors Suzhou, to the detriment of MFlex's public stockholders.

66.     Further, Section 10.3 of the Merger Agreement requires the Company to pay Suzhou a termination fee of $18.3 million in the event the Company decides to pursue any alternative offer.   Based on a transaction value of $610 million, this coercive termination fee of approximately 3% would require any competing bidder to agree to pay a naked premium simply for the right to provide MFlex's stockholders a superior offer.

67.     UEL and the Company entered into the Indemnification Letter, pursuant to which UEL agreed to pay to Suzhou, on behalf of the Company, the entire termination fee if the termination fee becomes payable as a result of the requisite shareholder vote not being obtained.

68.     Finally, UEL entered into the Support Agreement in which it agreed to vote 9,720,610 shares of its common stock, or approximately 39.5% of its total outstanding shares, in favor of the Proposed Transaction.

69.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The narrow circumstances under which the Board may respond to alternative proposals and the Company's inability to terminate the Merger Agreement if it accepts a superior proposal fail to provide an effective "fiduciary out" under the Merger Agreement.

70.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## THE PROXY FAILS TO DISCLOSE MATERIAL INFORMATION

71.     On April 28, 2016, the Company filed the materially incomplete and misleading Proxy with the SEC and disseminated it to MFlex's stockholders.   The Proxy, which is devised to solicit stockholders to vote in favor of the Proposed Transaction, fails to provide material information necessary for MFlex's stockholders to cast an informed vote on the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

72.     The omitted information described herein, if and when disclosed, would significantly alter the totality of information available for consideration by the average MFlex stockholder.   As set forth in detail below, the Proxy omits and/or provides materially misleading information regarding: (i) the sales process leading up to the Proposed Transaction; (ii) conflicts of interest; (iii) the financial analyses performed by Jefferies; and (iv) the Company's financial projections, which Jefferies relied upon in rendering its fairness opinion to the Board.   The absence of this critical information prevents stockholders from making their own value determination of MFlex as a standalone company compared to what is being offered in the Proposed Transaction.

### *Material Omissions Concerning the Flawed Sale Process*

73.     Defendants failed to disclose material information relating to, among other things, the sales process leading up to the Proposed Transaction, including:

(a)     The Company's determination of $24.00 being the required offer amount and why this offer had to be made in cash;

(b)     How many parties were included on Jefferies' initial list of potential bidders, and why the Board narrowed this list down to six;

(c)     What happened to the sixth potential bidder Defendant Meshgin was supposed to reach out to due to his prior relationship with that potential bidder; and

(d)     There reason(s) why UEL agreed to pay the entire termination fee in the event the Board does not receive the required stockholder approve for the Proposed Transaction.

74.     The omission of the above information makes the following information materially misleading:

(a) On page 29 of the Proxy, the statement:

At a meeting of the Board of Directors held on September 17 and September 18, 2015, Mr. Meshgin reviewed with the Board of Directors, along with its advisors, the terms of the revised non-binding indication of interest presented by DSBJ. After discussion, the Board of Directors instructed Mr. Meshgin to convey to DSBJ that the Board of Directors would not move forward unless BSBJ's offer provided for a proposed purchase price of no less than $24.00 per share in cash, was not subject to any financing contingencies, provided for an escrow arrangement whereby 3% of the purchase price would be funded into an escrow account upon signing of the definitive agreement, and allocated any regulatory risks associated with the proposed transaction to DSBJ.

Additionally, the Board of Directors instructed Mr. Meshgin to convey to DSBJ that if those terms were acceptable to DSBJ, it should submit a new offer within two weeks.

(b)– (c) On page 31 of the Proxy, the statements:

Jefferies prepared a list of potential bidders for the Company, and worked with Company management and the Board of Directors to determine which of the parties on the list were most likely to be interested in pursuing a transaction. Following the exercise, the Company, in consultation with Jefferies, narrowed the list to the six most likely bidders, and determined that Jefferies would contact five of those parties, and Mr. Meshgin would contact the sixth party due to his existing relationship with the party.

(d) page 17 of the Proxy, the statement:

UEL and the Company entered into an indemnification letter, pursuant to which UEL agreed to pay to DSBJ, on behalf of the Company, the termination fee if the termination fee becomes payable as a result of our stockholder approval, or UEL's shareholder approval to vote its Company shares in favor or the merger, not having been obtained.

75.     The above statements are rendered misleading by the omissions because they give a materially incomplete and misleading picture of the sales process, and in particular, fail to disclose all material facts necessary for shareholders to determine whether the Board carried out a full and fair sales process designed to maximize the sales price.

### Material Omissions Concerning Potential Conflicts of Interest

76.     The Proxy states:

Mr. Meshgin offered to refer Mr. Zhao to investment bankers at Citigroup who are familiar with MFLEX's business so that DSBJ could consider engaging Citigroup as its financial advisor. After the meeting

had concluded, Mr. Meshgin introduced Mr. Zhao to his contact at Citigroup Global Markets by e-mail.

77.     The above statement is materially misleading because it fails to disclose MFlex's and Meshgin's prior relationship with Citigroup and explain why Citigroup was familiar with MFlex.

78.     This information is material because it goes to the credibility of the process, whether Citigroup was conflicted as a result of its prior relationship with MFlex and whether Citigroup may have been providing Suzhou with confidential information about MFlex in order to facilitate a transaction and secure future business from Suzhou.

79.     According to a February 4, 2016 CNN Money news article, entitled *MFLEX Enters Into Definitive Merger Agreement to be Acquired by Suzhou Dongshan Precision Manufacturing., Ltd. for $23.95 Per Share*, "Mr. Meshgin and the MFLEX senior management team are expected to remain with MFLEX in their same capacities."

80.     Nowhere in the Proxy is there any mention of Meshgin staying on as CEO of the merged company, when discussions concerning his role in the merged company occurred, who was involved in the discussions or the substance of such discussions.

81.     This information is material because it goes to the credibility of the process and informs stockholders of Meshgin's potential conflicts of interest that were

obviously present while he acted as the primary negotiator with Suzhou and other potential bidders.

### Material Omissions Concerning Jefferies' Analysis

82.     The Proxy describes Jefferies' fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Jefferies' fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.   Without this information, as described below, MFlex's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Jefferies' fairness opinion in determining whether to vote in favor of the Proposed Transaction.

83.     With respect to Jefferies' *Selected Public Companies Analysis,* the Proxy fails to disclose:

(a)     the individual multiples for each of the selected public companies analyzed, including: (i) EV/ CY2015E Revenue,

(ii) EV/CY2016E Revenue,

(iii) EV/CY2017E Revenue,

(iv) EV/CY2015E Adjusted EBITDA,

(v) EV/CY2016E Adjusted EBITDA,

(vi) EV/CY2017E Adjusted EBITDA,

(vii) CY2015E Price/Adjusted Earning,

(viii) CY2016E Price/Adjusted Earning,

(ix) CY2017E Price/Adjusted Earning; and

(b)     whether Jefferies performed any type of benchmarking analysis for

MFlex in relation to the selected public companies.

84.     The omission of this information renders the following information on

pages 43-45 of the Proxy misleading:

*Selected Public Companies Analysis.* Jefferies reviewed publicly available financial, stock market and operating information of the Company and the following 10 selected U.S. and Europe based companies in the electronics manufacturing service ("EMS") and printed circuit board manufacturing ("PCB") industries with revenues under $30.0 billion, gross margins between 5.0% and 20.0% and EBITDA margins less than 25%, which Jefferies in its professional judgment considered generally relevant for comparative purposes as publicly traded companies. These 10 companies are collectively referred to in this section as the "selected companies":

*Printed Circuit Board Manufacturing Industry*

- TTM Technologies Inc. (TTMI)
- AT&S Austria (AUS)
- TT Electronics plc (TTG)

*Electronics Manufacturing Service Industry*

- Flextronics International Ltd. (FLEX)
- Jabil Circuit Inc. (JBL)
- Sanmina Corporation (SANM)
- Plexus Corp. (PLXS)
- Benchmark Electronics Inc. (BHE)
- Fabrinet (FN)
- Ducommun Inc. (DCO)

Jefferies reviewed enterprise values, calculated as fully diluted equity values based on the closing price of the Company's common stock on February 3, 2016, plus total debt, preferred stock and minority interests (as applicable) less cash and cash equivalents (in each case as of December 31, 2015), as a multiple for calendar years 2015, 2016 and 2017 of (i) estimated revenue; (ii) estimated adjusted EBITDA; and (iii) estimated price/adjusted earnings. Financial data of the selected

companies were based on publicly available Wall Street research analysts' estimates and other publicly available information. Financial data of the Company was based on both the Company management forecasts and publicly available Wall Street research analysts' estimates.

*(i) Estimated Revenue.* The overall low to high estimated revenue multiples for calendar years 2015, 2016, and 2017 observed for the selected companies were 0.3x to 1.0x (with a median of 0.5x and a 25th to 75th percentile range of 0.3x to 0.6x), 0.3x to 0.9x (with a median of 0.5x and a 25th to 75th percentile range of 0.3x to 0.6x), and 0.2x to 0.8x (with a median of 0.5x and a 25th to 75th percentile range of 0.3x to 0.6x), respectively. Jefferies noted that the estimated revenue multiples for calendar years 2015, 2016, and 2017 observed for the Company were 0.3x for each year based on both Company management forecasts and Wall Street research analysts' estimates.

Jefferies then applied selected ranges of estimated revenue for calendar years 2015, 2016 and 2017 to estimated revenue multiples of 0.4x to 0.6x for each such year derived from the selected companies to corresponding data of the Company based on the Company management forecasts. This analysis indicated the following approximate implied per share reference ranges for the Company, as compared to the merger consideration:

**Implied Per Share Reference Ranges**
**Based on:**

| CY2015E Revenue | CY2016E Revenue | CY2017E Revenue | Merger Consideration |
|---|---|---|---|
| $18.43 — $23.41 | $18.82 — $23.99 | $19.50 — $25.01 | $23.95 |

*(ii) Estimated Adjusted EBITDA.* The overall low to high estimated adjusted EBITDA multiples for calendar years 2015, 2016, and 2017 observed for the selected companies were 3.5x to 11.0x (with a median of 5.5x and a 25th to 75th percentile range of 4.9x to 7.0x), 3.5x to 8.5x (with a median of 5.1x and a 25th to 75th percentile range of 4.5x to 6.3x), and 2.9x to 7.3x (with a median of 4.7x and a 25th to 75th percentile range of 4.3x to 5.5x)[1], respectively. Jefferies noted that the estimated adjusted EBITDA multiples for calendar years 2015, 2016, and 2017 observed for the Company were 2.4x, 2.8x and 2.8x, respectively, based on the Company management forecasts, and 2.3x, 2.7x and 2.5x, respectively, based on publicly available Wall Street research analysts' estimates.

Jefferies then applied selected ranges of estimated adjusted EBITDA for calendar years 2015, 2016 and 2017 to estimated adjusted EBITDA multiples of 4.0x to 5.5x for 2015, 3.5x to 5.1x for 2016 and 3.0x to 4.7x for 2017, derived from the selected companies to corresponding data of the Company based on the Company management forecasts. This analysis indicated the following approximate implied per share reference ranges for the Company, as compared to the merger consideration:

**Implied Per Share Reference Ranges**
**Based on:**

| | Merger Consideration |
|---|---|

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| CY2015E Adj. EBITDA | CY2016E Adj. EBITDA | CY2017E Adj. EBITDA | |
|---|---|---|---|
| $22.66 — $27.97 | $19.04 — $23.88 | $17.56 — $22.73 | $23.95 |

*(iii) Estimated Price/Adjusted Earnings.* The overall low to high estimated price/adjusted earnings multiples for calendar years 2015, 2016, and 2017 observed for the selected companies were 4.1x to 23.2x (with a median of 12.0x and a 25th to 75th percentile range of 8.0x to 16.6x), 5.8x to 15.7x (with a median of 8.6x and a 25th to 75th percentile range of 7.3x to 12.8x), and 5.1x to 13.9x (with a median of 7.4x and a 25th to 75th percentile range of 6.3x to 11.5x), respectively. Jefferies noted that the estimated price/adjusted earnings multiples for calendar years 2015, 2016, and 2017 observed for the Company were 9.9x, 15.3x and 17.3x, respectively, based on the Company management forecasts, and 9.0x and 12.0x for 2015 and 2016, respectively, based on publicly available Wall Street research analysts' estimates. A price/adjusted earnings multiple based on publicly available Wall Street research analysts' estimates was not available for 2017.

¹ For calendar year 2017, there was one non-observable or not available adjusted EBITDA multiple input for one of the selected companies.

Jefferies then applied selected ranges of earnings per share for calendar years 2015, 2016 and 2017 to estimated price/adjusted earnings multiples of 7.5x to 12.0x for 2015, 6.0x to 8.6x for 2016 and 5.5x to 7.4x for 2017, derived from the selected companies to corresponding data of the Company based on the Company management forecasts. This analysis indicated the following approximate implied per share reference ranges for the Company, as compared to the merger consideration:

**Implied Per Share Reference Ranges**
**Based on:**

| CY2015E Price/Adj. Earnings | CY2016E Price/Adj. Earnings | CY2017E Price/Adj. Earnings | Merger Consideration |
|---|---|---|---|
| $12.82 – $20.52 | $6.67 – $9.56 | $5.40 – $7.26 | $23.95 |

85.   With respect to Jefferies' *Selected Precedent Transactions Analysis,* the Proxy fails to disclose: (a) the individual multiples for each of the selected transactions analyzed, including (b) EV/LTM Revenue, (c) EV/LTM Adjusted EBITDA; and (d) whether Jefferies performed any type of benchmarking analysis for MFlex in relation to the selected transactions.

86.   The omission of this information renders the following information on pages 45-46 of the Proxy misleading:

> *Selected Precedent Transactions Analysis.* Using publicly available information, Jefferies reviewed financial data relating to the following 11 selected transactions, since January 1, 2006 for U.S. and Europe-based EMS and PCB companies with revenues between $75.0 million to $12.0 billion, gross margins (where available) between 5.0% and 25.0% and EBITDA margins less than 25%, which Jefferies in its professional judgment considered generally relevant for comparative purposes as transactions involving target companies with operations in the electronics manufacturing service and printed circuit board manufacturing industries. These 11 transactions are collectively referred to in this section as the "selected transactions":

| Announcement Date | Acquirer | Target |
|---|---|---|
| September 22, 2014 | TTM Technologies | Viasystems |
| June 27, 2012 | Chase Corporation | NEPTCO |
| April 4, 2012 | Viasystems | DDi Corporation |
| April 26, 2011 | Silver Lake | SMART Modular Technologies |
| April 4, 2011 | Ducommun Technologies | LaBarge |
| January 3, 2011 | Rogers Corporation | Curamik Electronics |
| November 16, 2009 | TTM Technologies | Meadville Holdings Limited—PCB Business |
| October 6, 2009 | Viasystems Group | Merix Corporation |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| June 4, 2007 | Flextronics Corporation | Solectron Corporation |
| October 16, 2006 | Benchmark Electronics | Pemstar |
| August 3, 2006 | TTM Technologies | Tyco Electronics Printed Circuit Group |

Jefferies reviewed transaction values of the selected transactions, calculated as the purchase prices paid for the target companies involved in such transactions plus total debt, preferred stock and minority interests (as applicable) less cash and cash equivalents, as a multiple of such target companies' latest 12 months' (i) estimated revenue and (ii) estimated adjusted EBITDA. Financial data of the selected transactions were based on press releases, public filings and other publicly available information. Financial data of the Company were based on the Company management forecasts.

(i) *Estimated Revenue*. The overall low to high latest 12 months estimated revenue multiples observed for the selected transactions for which information was publicly available was 0.3x to 1.5x (with a median of 0.7x and a 25th to 75th percentile range of 0.5x to 1.0x). Jefferies then applied a selected range of latest 12 months estimated revenue multiples of 0.5x to 0.7x derived from the selected transactions to the Company's latest 12 months (as of December 31, 2015) revenue based on the Company's preliminary 2015 fiscal year results. This analysis indicated the following approximate implied equity value per share reference range for the Company, as compared to the merger consideration:

| **Implied Per Share Reference Range** | **Merger Consideration** |
|---|---|
| $20.92 — $25.90 | $23.95 |

(ii) *Estimated Adjusted EBITDA*. The overall low to high latest 12 months estimated adjusted EBITDA multiples observed for the selected transactions for which information was publicly available was 5.8x to 8.9x (with a median of 7.7x and a 25th to 75th percentile range of 6.8x to 8.3x). Jefferies then applied a selected range of latest 12 months estimated

adjusted EBITDA multiples of 6.0x to 7.7x derived from the selected transactions to the Company's latest 12 months (as of December 31, 2015) adjusted EBITDA based on the Company's management's data. This analysis indicated the following approximate implied equity value per share reference range for the Company, as compared to the merger consideration:

| Implied Per Share Reference Range | Merger Consideration |
|---|---|
| $29.74 — $35.76 | $23.95 |

87.     With respect to Jefferies' *Discounted Cash Flow Analysis,* the Proxy fails to disclose:

(a)     the definition of "unlevered free cash flow" utilized by Jefferies in this analysis;

(b)     the individual inputs and assumptions utilized by Jefferies to derive the discount rate range of 9.5% to 10.5%; and

(c)     the individual inputs and assumptions utilized by Jefferies to derive the discount rate range of 13.0% for the NOL carryforwards.

88.     The omission of this information renders the following information on page 46 of the Proxy misleading:

*Discounted Cash Flow Analysis.* Jefferies performed a discounted cash flow analysis of the Company by calculating the estimated present value of the unlevered free cash flows that the Company had forecasted to generate for the full fiscal years 2016 through 2019 based on management's forecasts. For purposes of this analysis, (i) the estimated net present value (as of December 31, 2015) of the Company's potential net operating loss carryforwards and other potential tax attributes expected by the Company management to be utilized by the Company were taken into account using a 13% cost of equity as a discount rate, and (ii) stock-based compensation was treated as a cash expense. The terminal value of the Company was calculated assuming perpetual

growth rates from 1.0% to 3.0% in unlevered free cash flow from 2019 onwards. A discount rate range of 9.50% to 10.50% based on the weighted average cost of capital for the Company was then applied to the Company's projected unlevered free cash flow, resulting in a range of implied EBITDA exit multiples of 3.0x to 4.5x. This analysis indicated the following approximate implied equity value per share reference ranges for the Company, as compared to the merger consideration:

| Implied Equity Value Per Share Reference Range | Merger Consideration |
| :---: | :---: |
| $17.88 — $21.71 | $23.95 |

89.    The above statements were materially false and misleading when made because they fail to disclose key inputs necessary to make Jefferies' analyses, upon with the Board relied in recommending the Proposed Transaction, complete. Moreover, the multiples Jefferies applied in its *Selected Public Companies Analysis* and *Selected Transactions Analysis* are inexplicably at the low end of the range, despite that the Company has above average profit margins and EBITDA as compared to its industry competitors.

90.    These discrepancies, which make the deal price appear better than it actually is, must be explained.

**Material Omissions Concerning Management's Financial Projections**

91.    The Proxy states Jefferies reviewed certain information furnished to it by the Company's management, including financial forecasts and analyses, relating to the business, operations and prospects of the Company in arriving at its fairness opinion. However, the Proxy omits from the Company's financial projections for the (i) preliminary projections; (ii) the August 7th update; (iii) the September 24th update; (iv) the December 15th update; and (v) the January 27th update provided by MFlex

management and relied upon by Jefferies for purposes of its analysis for fiscal years 2016 to 2019, the following items:

        (i) EBIT (or D&A),

        (ii) taxes (or tax rate),

        (iii) capital expenditures,

        (iv) changes in net working capital,

        (v) stock-based compensation expense,

        (vi) free cash flows (January 27 only),

        (vii) any other adjustments to unlevered free cash flow, and

        (viii) unlevered free cash flows.

92.    In addition, the Proxy fails to disclose material information concerning the creation of the projections, including: (i) the specific primary factors leading to the significant declines in MFlex management projections between the (a) preliminary projections, (b) the August 7th update, (c) the September 24th update, (d) the December 15th update, and (e) the January 27th update.

93.    The omission of this information renders the following information misleading:

    (a) On pages 49-51 of the Proxy, the statements:

***Preliminary Projections***

    The following table includes the projections of estimated reported net sales, gross profit, net income, EBITDA (earnings before interest, taxes, depreciation and amortization), non-GAAP earnings per share and free cash flow for the years covered by the preliminary projections:

\*   Adjusted for stock-based compensation expenses and impairment and restructuring expenses. Includes non-recurring gain or loss on foreign currency exchange and gain or loss on derivative financial instruments.

| ($ Millions, except non-GAAP EPS) | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Net Sales | $ 692.1 | $ 798.1 | $ 895.8 | $ 980.0 | $ 1065.7 |
| Gross Profit | $ 86.8 | $ 101.9 | $ 116.2 | $ 129.9 | $ 144.0 |
| Net Income | $ 39.7 | $ 47.2 | $ 57.0 | $ 66.7 | $ 76.7 |
| EBITDA | $ 89.8 | $ 99.4 | $ 113.9 | $ 127.7 | $ 140.9 |
| Non-GAAP EPS* | $ 1.66 | $ 1.94 | $ 2.32 | $ 2.69 | $ 3.07 |
| Free Cash Flow** | $ 13.3 | $ 46.8 | $ 66.7 | $ 63.1 | $ 73.0 |

\*\* Defined as cash from operating activities less capital expenditures.

***August 7 Update***

On August 7, 2015, MFLEX revised the preliminary projections to reflect reduced operating expense estimates for 2015, slightly reduced gross margin percentage estimates in years 2016, 2017 and 2019, reduced effective tax rates estimates for 2015 and 2016, and a decrease in 2015 net sales to $691.8 million. As a result of these new assumptions, the Company's forecasts remained substantially the same; however, gross profit increased in 2015 and 2018, net income and non-GAAP earnings per share (EPS) increased (but decreased in 2019), earnings before interest, taxes, depreciation and amortization (EBITDA) increased in 2015, 2018 and 2019, and free cash flow increased in 2015 and 2016 (but decreased in 2017, 2018 and 2019).

The following table includes the projections of estimated gross profit, net income, EBITDA, non-GAAP earnings per share and free cash flow for the years covered by the August 7 update to the preliminary projections:

| ($ Millions, except non-GAAP EPS) | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Net Sales | $ 691.8 | $ 798.1 | $ 895.8 | $ 980.0 | $ 1065.7 |
| Gross Profit | $ 86.9 | $ 101.6 | $ 115.8 | $ 131.6 | $ 141.9 |
| Net Income | $ 45.4 | $ 48.7 | $ 57.4 | $ 68.2 | $ 75.0 |
| EBITDA | $ 93.7 | $ 99.4 | $ 113.9 | $ 129.9 | $ 141.6 |
| Non-GAAP EPS* | $ 1.92 | $ 2.05 | $ 2.33 | $ 2.74 | $ 3.00 |
| Free Cash Flow** | $ 20.2 | $ 55.6 | $ 61.1 | $ 58.9 | $ 60.6 |

\*  Adjusted for stock-based compensation expenses and impairment and restructuring expenses. Includes non-recurring gain or loss on foreign currency exchange and gain or loss on derivative financial instruments.

\*\* Defined as cash from operating activities less capital expenditures.

**September 24 Update**

On September 24, 2015, the preliminary projections were further revised by MFLEX's management to reflect the changing global economic outlook and then-recent third party analyst reports that predicted slower growth in the global smartphone market. The Company also took into account the unexpected declining demand from one if its major customers, and management's view that revenues from certain of its major customers would be lower than previously forecast, thereby leading to a downward revision in estimated net sales and other financial metrics for the years covered.

The following table includes the projections of estimated reported net sales, gross profit, net income, EBITDA, non-GAAP earnings per share and free cash flow for the years covered by the September 24 update to the preliminary projections:

| ($ Millions, except non-GAAP EPS) | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Net Sales | $652.1 | $698.5 | $754.0 | $819.6 | $876.0 |
| Gross Profit | $ 81.3 | $ 77.6 | $ 83.7 | $ 95.2 | $103.1 |
| Net Income | $ 44.4 | $ 30.5 | $ 33.6 | $ 41.2 | $ 46.2 |
| EBITDA | $ 92.3 | $ 78.7 | $ 84.3 | $ 93.5 | $101.0 |
| Non-GAAP EPS* | $ 1.86 | $ 1.33 | $ 1.39 | $ 1.68 | $ 1.86 |
| Free Cash Flow** | $ 27.5 | $ 39.8 | $ 55.7 | $ 45.1 | $ 40.2 |

\*  Adjusted for stock-based compensation expenses and impairment and restructuring expenses. Includes non-recurring gain or loss on foreign currency exchange and gain or loss on derivative financial instruments.
\*\* Defined as cash from operating activities less capital expenditures.

### December 15 Update

Based upon projections created for its annual operating plan process, the Company provided a further updated version of the preliminary projections on December 15, 2015 that updated its sales forecast for the fourth quarter of 2015 based on lower than expected demand from one of its major customers, and slightly refined estimates for 2016. This version of the preliminary projections also included an "upside case" that reflected the estimated increase in sales that would have potentially resulted if MFLEX were awarded a new program with one of its key customers. Subsequently, the Company was not awarded this new program.

The following table includes the projections of estimated reported net sales, gross profit, net income, EBITDA, non-GAAP earnings per share and free cash flow for the 2016 fiscal year set out in the December 15 update to the preliminary projections:

| ($Millions, except non-GAAP EPS) | 2016 |
|---|---|
| Net Sales | $695.0 |
| Gross Profit | $ 76.2 |
| Net Income | $ 30.2 |
| EBITDA | $ 77.4 |
| Non-GAAP EPS* | $ 1.34 |
| Free Cash Flow** | $ 20.3 |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

* Adjusted for stock-based compensation expenses and impairment and restructuring expenses. Includes non-recurring gain or loss on foreign currency exchange and gain or loss on derivative financial instruments.
** Defined as cash from operating activities less capital expenditures.

### January 27 Update

The Company prepared a further update to the preliminary projections on January 27, 2016 that was shared with DSBJ on that date and was provided to Jefferies for use in Jefferies' financial analyses. This update reduced sales estimates for 2016 and was based on the continuing slow pace of orders from one of the Company's major customers, based on a revised longer term outlook with another customer, and used more conservative overall net sales growth forecasts in 2017-2019.

The following table includes the projections of estimated reported net sales, gross profit, net income, EBITDA and non-GAAP earnings per share for the years covered by the January 27 update of the preliminary projections:

| ($ Millions, except non-GAAP EPS) | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| Net Sales | $661.2 | $704.7 | $748.3 | $791.2 |
| Gross Profit | $ 70.6 | $ 70.2 | $ 78.0 | $ 83.8 |
| Net Income | $ 24.8 | $ 22.7 | $ 27.4 | $ 30.7 |
| EBITDA | $ 72.4 | $ 72.7 | $ 78.3 | $ 83.7 |
| Non-GAAP EPS* | $ 1.11 | $ 0.98 | $ 1.16 | $ 1.28 |

* Adjusted for stock-based compensation expenses and impairment and restructuring expenses. Includes non-recurring gain or loss on foreign currency exchange and gain or loss on derivative financial instruments.

94.  These material omissions of the best estimates of the Company's financial future must be remedied prior to the stockholder vote in order to allow MFlex stockholders to make a fully informed decision on the Proposed Transaction.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

95.     As a result of the Individual Defendants' violations of the federal securities laws, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of MFlex's assets and business and will be prevented from obtaining the intrinsic value of their equity ownership of the Company.

96.     Unless enjoined by this Court, the Individual Defendants will continue violate the federal securities laws, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

97.     Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(a) of the Exchange Act and
### Rule 14a-9 Promulgated Thereunder
### (Against MFlex and the Individual Defendants)

98.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier

communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

100.  During the relevant period, Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

101.  By virtue of their positions within the Company, the MFlex Defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was prepared, reviewed, and/or disseminated by the MFlex Defendants. The Proxy misrepresented and/or omitted material facts, as detailed above.  The MFlex Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.  Defendants have also failed to correct the Proxy, and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

102.  The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proxy Statement.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

103.   By reason of the foregoing, the Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

104.   Unless the Individual Defendants are enjoined by the Court, they will continue to violate the law, to the irreparable harm of the members of the Class.

105.   Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Without this information, Plaintiff and MFlex stockholders will be prevented from intelligently and rationally deciding for themselves whether they approve of the merger or desire to seek appraisal.  Therefore, injunctive relief is appropriate to ensure the MFlex Defendants' misconduct is corrected

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### (Against All Individual Defendants)

106.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.   Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act or any of the rules promulgated thereunder.  Such "controlling persons" are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

108.   By reason of the allegations herein, Defendants violated §14(a) of the Exchange Act by issuing and publishing the Proxy, which contained untrue statements of material fact concerning the Proposed Transaction, and omitted material facts concerning the Proposed Transaction necessary in order to make the statements in the Proxy not misleading.

109.   The Individual Defendants were controlling persons of MFlex within the meaning of §20(a) of the Exchange Act.

110.   The Individual Defendants, by virtue of their positions as officers and/or directors of MFlex, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs, and therefore exercised general control over the operations of MFlex.

111.   The Individual Defendants, by virtue of their positions as officers and/or directors of MFlex, had the power or ability to control the issuance, publication, and contents of the Proxy.  The Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered concerning the Proposed Transaction.

112.   The Individual Defendants, by virtue of their positions as officers and/or directors of MFlex, had the ability to prevent the issuance of the materially misleading

Proxy or to cause the Proxy to be corrected so that it was not in violation of §14(a) of the Exchange Act.

113.   By virtue of the foregoing, the Individual Defendants violated §20(a) of the Exchange Act, and Plaintiff is entitled to relief.

## COUNT III
## Aiding and Abetting
## (Against Meshgin, Tan and the Suzhou)

114.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115.   As alleged herein, the MFlex Defendants violated the federal securities laws in connection with the dissemination of the Proxy.

116.   Meshgin, Tan and Suzhou knew of the material information that should have been, but was not, disclosed in the Proxy giving rise to the MFlex Defendants' underlying liability for violating the federal securities laws.

117.   Meshgin, Tan and Suzhou had a conscious and specific motivation for either bringing about such securities violations or failing to prevent such securities violations before they occurred.

118.   Meshgin and Tan, as members of the Board, had access to the Proxy before it was filed with the SEC and disseminated to stockholders.

119.   Moreover, under Section 8.6 of the Merger Agreement:

Public Announcements; Public Disclosures, "Parent and the Company shall consult with each other before issuing, and give each other the opportunity to review and comment upon, any press release or other

public statements with respect to the transactions contemplated by this Agreement, including the Merger, and shall not issue any such press release or make any such public statement prior to such consultation, except as such party may reasonably conclude may be required by Applicable Law, court process or by obligations pursuant to any listing agreement with any national securities exchange or national securities quotation system. . . .

120.   Nonetheless, Meshgin, Tan and Suzhou all want stockholder approval of the Proposed Transaction and are specifically motivated to suppress material information that may weaken or undermine stockholder support for the Proposed Transaction.

121.   Meshgin, Tan and Suzhou did act, or fail to act, in a manner so as to aid and abet the MFlex Defendants' violations of the federal securities laws.

122.   As a result of the conduct of Meshgin, Tan and Suzhou, Plaintiff and all other MFlex stockholders stand to suffer irreparable harm

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against Defendants as follows:

A.   Declaring that this action is properly maintainable as a class action and certifying Plaintiff as Class representative;

B.   Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain an

agreement providing fair and reasonable terms and consideration to Plaintiff and the Class;

C.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.     Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

E.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.     Granting such other and further equitable relief as this Court may deem just and proper.

Dated: April 29, 2016                    Respectfully submitted,

                                         BRODSKY & SMITH, LLC

                         By: _____
                                         Evan J. Smith (SBN242352)
                                         Lance Greene
                                         9595 Wilshire Boulevard, Suite 900
                                         Beverly Hills, CA 90212
                                         Tel.: (877) 534-2590
                                         Fax: (310) 247-0160

                                         LEVI & KORSINSKY, LLP
                                         Shannon L. Hopkins
                                                 (to be admitted *pro hac vice*)
                                         Sebastiano Tornatore
                                                 (to be admitted *pro hac vice*)
                                         733 Summer Street, Suite 304
                                         Stamford, CT 06901
                                         Tel.: (212) 363-7500

                                         *Attorneys for Plaintiff*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

New York, NY 10004
T:212-363-7500
F:212-363-7171
www.zlk.com

## CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Cynthia Lehn, certifies as follows:

1. I have reviewed the complaint to be filed against Multi-Fineline Electronix, Inc. ("MFLEX") and others and authorize the filing of it.

2. I have retained Levi & Korsinsky LLP to seek my appointment as lead plaintiff and pursue this class action on my behalf and on behalf of the proposed class.

3. I did not purchase securities of MFLEX at the direction of counsel or in order to participate in this lawsuit.

4. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5. I owned MFLEX shares as of February 4, 2016, the date the Merger Agreement was announced, and continue to own these shares.

6. I have not sought to serve or served as a class representative under the federal securities laws in the last three years, other than listed below (if any):

7. I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct. Executed this 28th day of April 2016.

Signed: _Cynthia Lehn_

NAME: Cynthia Lehn

IP: 72.238.127.163

2